## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **IN RE: ELIQUIS (APIXABAN)** | **MDL 2754** |
| **PRODUCTS LIABILITY LITIGATION** : | |
| BRUCE BATES : | Case No.: 1:17-cv-01237-DLC |
| : | |
| : | |
| Plaintiff, : | **FIRST AMENDED** |
| -against- : | **COMPLAINT** |
| : | |
| BRISTOL-MYERS SQUIBB COMPANY and : | **JURY TRIAL DEMANDED** |
| PFIZER INC., : | |
| : | |
| Defendants. : | |
| : | |

Plaintiff BRUCE BATES, by and through their attorney, SALIM-BEASLEY, LLC, bring this First Amended Complaint against Defendants BRISTOL-MYERS SQUIBB COMPANY and PFIZER INC. (collectively, "Defendants"), as follows:

## COMPLAINT

## COMMON ALLEGATIONS

Plaintiff, at all times relevant hereto, was a citizen and resident of the State of Illinois who suffered personal injuries, as a result of his use of Eliquis.

## INTRODUCTION

1.     This action involves claims of personal injury, economic damages, punitive damages, and other claims of damage arising from injuries sustained by the Plaintiff, BRUCE BATES, as a direct and proximate result of both the defective nature of defendants BRISTOL-

MYERS SQUIBB COMPANY and PFIZER INC. pharmaceutical product, Eliquis, also known as apixaban.

<div align="center">**PARTIES**</div>

2.    At all times hereinafter mentioned the Plaintiff, BRUCE BATES (herein referred to as "Plaintiff"), was a citizen and resident of the State of Illinois, County of Cook.

3.    Upon information and belief, at all times hereinafter mentioned, defendant, BRISTOL-MYERS SQUIBB COMPANY ("BMS"), was and is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 345 Park Avenue, New York, New York 10154. Its registered agent for service of process is: c/o CT Corporation System, 111 8th Avenue, New York, NY 10011.  Defendant BMS is the holder of the approved New Drug Application ("NDA") for Eliquis as well as the supplemental NDA.

4.    As part of its business, BMS was and is involved in the research, development, sales, and marketing of pharmaceutical products including Eliquis.

5.    Defendant PFIZER was and is in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Eliquis for use as an oral anticoagulant.

6.    At all relevant times, Defendant BMS was in the business of and did design, research, manufacture, test, advertise, promote, market, sell and distribute the drug Eliquis for use as an oral anticoagulant.

7.    Upon information and belief, at all times hereinafter mentioned, defendant, PFIZER INC. ("Pfizer"), was and is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 235 East 42nd Street, New York, New York 10017. Its registered agent for service of process is: c/o CT Corporation System, 111 8th Avenue, New York, NY 10011.

8.    Defendant PFIZER was and is in the business of and did design, research, manufacture, test, advertise, promote, market, sell and distribute the drug Eliquis for use as an oral anticoagulant.

9.    In 2007, Defendants entered into a worldwide collaboration to "commercialize" apixaban (Eliquis), which they have promoted as combining BMS's "long-standing strengths in cardiovascular drug development and commercialization" with PFIZER's "global scale and expertise in this field."

## JURISDICTION

10.    This Court has personal jurisdiction over the Defendants based on Diversity of Citizenship pursuant to 28 U.S.C. Section 1332(a)(1), and the amount in controversy is well in excess of the jurisdictional limit of $75,000.

11.    At all times herein mentioned defendants BRISTOL-MYERS SQUIBB COMPANY, was and is a corporation authorized to do business under and by virtue of the laws of the State of New York.

12.    At all times herein mentioned defendants PFIZER INC., was and is a corporation authorized to do business under and by virtue of the laws of the State of New York.

13.    Defendants BRISTOL-MYERS SQUIBB COMPANY and PFIZER INC., received substantial revenue from goods used or consumed or service rendered in the State of New York.

## PLAINTIFF-SPECIFIC FACTUAL BACKGROUND

14.    Plaintiff Bruce Bates was prescribed Eliquis, also known as apixaban, because of a diagnosis of atrial fibrillation.  On or about June 26 2014, Plaintiff BRUCE BATES suffered severe physical, economic, and emotional injuries as a result of Eliquis including, but not limited to, Plaintiff suffering from internal bleeding.

15.     On that date, Bruce Bates, a passenger on Southwest Airlines, had trouble breathing during his flight to the extent that he had to receive oxygen.  After arriving in Illinois, Mr. Bates presented to the emergency room where it was found that he had a dangerously law hemoglobin and heme-positive stools, which was why he had trouble breathing.     Mr. Bates was administered over 5-units of packed red blood cells and also was given iron. Eliquis was held. Mr. Bates as a result of volume depletion and dehydration from his internal bleeding also suffered from an acute kidney injury, which as described further below.   Mr. Bates remained hospitalized until July 10, 2014.

16.     As a direct and proximate result of Defendants' conduct, Plaintiffs suffered and incurred harm including severe pain and suffered personal injuries and incurred damages which include severe pain and suffering, medical expenses and other economic and noneconomic damages.

17.     Defendants, BRISTOL-MYERS SQUIBB COMPANY and PFIZER INC., (hereinafter collectively referred to as "Defendants") designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed Eliquis, as well as dealt with governmental regulatory bodies.

18.     In written information about the safety and risks of Eliquis, Defendants negligently and fraudulently represented to the medical and healthcare community, including Plaintiff's prescribing doctor, the Food and Drug Administration (hereinafter referred to as the "FDA") , to Plaintiff and the public in general, that Eliquis had been tested and was found to be safe and effective for its indicated uses.  Defendants concealed their knowledge of Eliquis' defects, from Plaintiff, the FDA, the public in general and the medical community, including Plaintiff's prescribing doctor.

19. These representations were made by Defendants with the intent of defrauding and deceiving Plaintiff, the public in general, and the medical and healthcare community including Plaintiff's prescribing doctor, and were made with the intent of inducing the public in general, and the medical community in particular, to recommend, dispense and purchase Eliquis, all of which evinced a callous, reckless, willful, depraved indifference to health, safety and welfare of the Plaintiff herein. Plaintiffs and the prescribing physicians were not aware of the falsity of these representations.

## FACTUAL ALLEGATIONS
## APPLICABLE TO ALL COUNTS

20. Atrial fibrillation is a common arrhythmia (abnormal heart beat) that increases the risk of blood clot formation, which gives rise to the potential for embolism and increased risk for stroke.

21. For generations, warfarin (Coumadin) has been prescribed for its anticoagulation effect by inhibiting certain clotting factors within the coagulation cascade. Warfarin works by blocking clotting factors that rely on Vitamin K. Vitamin K is used by multiple clotting factors to help the blood clot.

22. Coumadin can be carefully monitored and dose-adjusted by way of regular, routine monitoring of the prothrombin time ("PT") and International Normalization Ratio ("INR"). Eliquis' anticoagulation effect, in contrast, cannot be monitored at all. Additionally, unlike Eliquis, which has no publicly known antidote, the anticoagulation effects of Coumadin are reversible with the administration of vitamin K and/or the administration of coagulation factors such as fresh frozen plasma.

23. All anticoagulants have a risk of bleeding. Without an antidote, a bleed can quickly become a life-threatening situation. If a patient presents to the emergency room with a bleed

on warfarin, doctors have a variety of options to choose from depending on how quickly they need to reverse anticoagulation.  Because warfarin is a vitamin K antagonist, a patient on warfarin presenting with bleeding can have the anticoagulation effects completely reversed within a very short amount of time by administering vitamin K.

24.      Although warfarin is quickly reversible in the event of a bleed, one drawback is the amount of monitoring. Patients taking warfarin must be monitored every few weeks. Doctors test the amount of time it takes for a patient's blood to clot using the prothrombin time test.  The prothrombin test measures the International Normalized Ration (INR).  A high INR indicates a high risk of uncontrollable bleeding; a low INR indicates a high risk for blood clots.  In addition, patients taking warfarin must follow a strict diet since many green, leafy vegetable contain high amounts of Vitamin K.

25.      Given the inconvenience of warfarin and because the costs of warfarin plummeted after generic manufacturers entered the market, pharmaceutical companies saw an opportunity for profit so Defendants and other pharmaceutical manufacturers began the race to develop an alternative to warfarin.

26.      The first novel oral anticoagulant approved in the United States was Pradaxa (dabigatran) in 2010, followed by Xarelto (rivaroxaban) in 2011, Eliquis (apixaban) in 2012, and most recently, Savaya (edoxaban) in 2015.  Defendants received FDA approval to market Eliquis in 2012 (NDA 202155).

27.       Subsequent to approval, Pradaxa has a specific reversal agent (idarucizumab) for dabigatran, which is available for emergency / urgent procedures and in life-threatening or uncontrolled bleeding.

28.      Overall, dispensed outpatient prescriptions for NOACs increased by 6.8% to 11.1 million in the fourth quarter of 2015, compared to 2014 Q1. By the fourth quarter of 2015, the four

novel anticoagulants had captured 34% of the market, leaving 66% to warfarin. Among the new agents, rivaroxaban (Xarelto) led, with 17.5% of dispensed outpatient prescriptions, but apixaban (Eliquis) prescriptions increased four-fold over the time period and now account for 11.8% of dispensed outpatient prescriptions. For Eliquis, this 11.8% market share represents a 446.2% increase.

29.     At all relevant times, Defendants were in the business of and did design, research, manufacture, test, advertise, promote, market, sell and distribute Eliquis as a "new" or "novel" oral anticoagulant, also known as a Factor Xa inhibitor. Factor Xa is another factor on the coagulation cascade and forms the thrombin, which is required for blood to clot. By inhibiting Factor Xa, Eliquis prevents thrombin from forming, which prevents blood from clotting.

30.     Eliquis has two dosages—2.5 mg and 5 mg—approved by the FDA to reduce the risk of stroke and systemic embolism in patients with nonvalvular atrial fibrillation. The FDA, in March 2014, expanded the indicated use for the prophylaxis of deep vein thrombosis, which may lead to pulmonary embolism, in patients who have undergone hip or knee replacement. And in August 2014, the FDA label added that Eliquis is indicated for the treatment of DVT and PE, and for the reduction in the risk of recurrent DVT and PE following initial therapy. Among the uses for which Defendants obtained permission to market Eliquis was in the treatment of atrial fibrillation. Approval of Eliquis was based in large part on clinical trials known as ARISTOTLE.

31.     The ARISTOTLE study was conducted under the supervision and control of Defendants in various countries including China. However, Defendants' agents committed fraud in their conduct of the ARISTOTLE study, by concealing side effects which occurred in test users of Eliquis; a death which went unreported (whereas one purpose of the study was to study the rate of death in Eliquis users compared to others in Coumadin); loss of subjects to follow up; major dispensing errors including indicating that certain subjects were getting Eliquis when they were

not; poor overall quality control; and changing and falsifying records, including records disappearing just before the FDA made a site visit, reportedly on the order of an employee of BMS. Based upon information and belief, Defendants, as means of cutting costs, chose incompetent and untrustworthy agents in China to conduct the ARISTOTLE study.

32.    More specifically, Defendants and their agents committed fraud in their conduct of the ARISTOTLE study, by *inter alia,* concealing side effects that occurred in test users of Eliquis; concealing a death which went unreported (whereas one purpose of the study was to study the rate of death in Eliquis users compared to others on Coumadin); concealing loss of subjects to follow up; concealing major dispensing errors including indicating that certain subjects were getting Eliquis when they were not; having poor overall quality control; and changing and falsifying records, including records disappearing just before the FDA made a site visit, reportedly on the order of an employee of BMS (who was later terminated).

33.    At a Feb. 9, 2012 meeting between the FDA and BMS-Pfizer executives, the FDA is reported to have characterized the conduct of Defendants as showing a pattern of inadequate supervision.

34.    When the application by defendants to the FDA was pending, in 2012, Dr. Thomas Marcinak, a physician in the FDA who reviewed the data submitted by defendants in order to obtain approval to market Eliquis, objected to missing data from the ARISTOTLE study and recommended that the labeling which defendants were going to use with the drug should discuss the quality control problems in ARISTOTLE, the Chinese study. Dr. Marciniak concluded in a December 2012 memorandum that because vital data—primarily involving deaths—was missing from the trial, the data problems "destroy our confidence" that Eliquis reduces the risk of death.

35.     The label fails to disclose other, post-approval non-industry sponsored studies, which criticize the results of ARISTOTLE study, including the findings regarding frequency and severity of bleeds on Eliquis.

36.     In the Warnings and Precaution Section of the Eliquis label, there is nothing indicating to a physician or patient that there is no ability to monitor the anticoagulation effects of Eliquis or the consequences of the inability to accurately monitor the anticoagulation effects of the drug may be or the drug concentration level.  There is no warning, for example, that the inability to monitor the anticoagulation effects or drug concentration levels of Eliquis in one's system will delay intervention in the event of a medical emergency.   If there was an ability to monitor the anticoagulation effect, emergency providers and treating physicians could better asses and treat patients who present with life-threatening bleeds.

37.     The label, in the Warning and Precaution Section, fails to adequately warn physicians and patients to monitor patients' renal function at initiation and periodically while taking Eliquis.

38.     Instead of admitting the major errors and frauds involved in the ARISTOTLE study, Defendants misleadingly stated publicly that they were submitting "additional data" to the FDA, and to this date have never publicly acknowledged the missing and incorrect data submitted to the FDA, and to this date have never publicly acknowledged the missing and incorrect data submitted to the FDA, which would be of concern to prescribing physicians and the public.

39.     After employees of defendants wrote and submitted an article based on the ARISTOTLE study for the New England Journal of Medicine, the article was reportedly attacked for its accuracy and omissions by the former editor-in-chief of that journal, Arnold Relman, M.D., including the failure to show that Eliquis was any more efficacious than low-cost warfarin.

40.     Critically, there is no antidote to Eliquis, unlike warfarin. Therefore, in the event of hemorrhagic complications, there is no available or validated reversal agent or antidote, as there is for Coumadin.

41.     Defendants now market Eliquis as a new oral anticoagulant treatment alternative to warfarin (Coumadin), a long-established safe treatment for preventing stroke and systemic embolism. Defendants emphasize the alleged benefits of treatment with Eliquis over warfarin, in that Eliquis does not require periodic monitoring with blood tests, that Eliquis does not limit a patient's diet, and Eliquis has a set dose that fits all patients. But studies from 2014 and beyond have called into question all of these perceived advantages.

42.     The U.S. label approved when the drug was first marketed in the U.S. and at the time Plaintiff was using it in 2014 did not contain an adequate warning regarding the lack of antidote, inability to monitor degree of anticoagulation, the variability of drug concentration levels, and the significance of a bleeding event for patients who began to bleed, or how to potentially stop any bleeding events.

43.     After the drug was approved by the FDA, Defendants engaged in an aggressive marketing campaign for Eliquis, including extensive marketing directly to the public, via TV and print. The chief promotional aspect of the sales pitch was that, unlike with Coumadin, the blood levels of the patient did not need to be monitored.

44.     In the course of these direct-to-consumer advertisements, Defendants over promoted Eliquis as having simply two dosages, overstated the efficacy of Eliquis with respect to preventing stroke and systemic embolism, overstated and misrepresented fact that Eliquis has less major bleeding and stroke risk than warfarin, failed to adequately disclose to patients that there is no drug, agent, or means to reverse the anticoagulation effects of Eliquis, and that such irreversibility would have life-threatening and fatal consequences.

45.     From 2013 to present, Defendants aired several direct to consumer television advertisements, including, but not limited to, the "Bringing my Best," "Fisherman," and "Go for My Best" spots, all of which portray Eliquis as the "best" treatment for Afib and importantly, a better and *safer* alternative to Warfarin.  These ads were designed to influence patients, including the Plaintiff, to make inquiries to their prescribing physician about Eliquis and/or to request prescriptions for Eliquis.

46.     These ads overstated that Eliquis has less major bleeding risk and less stroke risk than Warfarin, and failed to adequately disclose to patients that there is no drug, agent or means to reverse the anticoagulation effects of Eliquis and that such irreversibility could have life-threatening and fatal consequences.

47.     Defendants in their labeling and marketing material downplay the risk of a worse outcome on Eliquis in the event of a bleeding event due to the lack of a reversal agent or ability to monitor to level of anticoagulation in a medical emergency.

48.     Defendants' marketing materials suggest that Eliquis represents a therapeutic simplification and therapeutic progress of anticoagulation therapy because it does not require dosage adjustments, does not requires patients to undergo periodic monitoring with blood tests and because there were no dietary restrictions.

49.     As the population shifts from Warfarin to NOACs, randomized controlled trials show the greater incidence of intracranial hemorrhaging with NOACs, including Eliquis, as compared with Warfarin.

50.     Randomized trials also show that NOACs are associated with a higher risk of clinically relevant bleeding than Warfarin.

51.    In these non-industry[1] sponsored trials, medical reviews, and meta-analysis, Eliquis is inferior to Warfarin despite Defendants marketing and promotional materials stating otherwise.

52.    In addition, meta-analysis shows that the NOACs, including Eliquis, are no more effective than warfarin in preventing ischemic strokes.

53.    In essence, the Defendants created a new drug, Eliquis, which is not better than warfarin from a safety perspective, and marketed it as a superior safety choice that required no blood test monitoring. The idea of this apparently easier-to-use anticoagulant evidently appealed to physicians, who were subject to extreme marketing and promotion by the Defendants, but ignores patient safety.

54.    Prior to Plaintiff's use of Eliquis, Plaintiff became aware of the existence of Eliquis and its general claims, based upon his prescribing physician's recommendation of the use of this medication.

55.    Based upon  information and belief, prior to Plaintiff's use of Eliquis, Plaintiff's prescribing physician would have received promotional materials and information from sales representatives of Defendants that Eliquis was just as or even more effective as warfarin (Coumadin) in reducing strokes in patients with non-valvular atrial fibrillation, and was more convenient, without also adequately informing prescribing physicians of potential risk of underdoing and overdoing due to the fixed dosages, that there was no reversal agent that could stop or control bleeding in patients taking Eliquis, there was no ability to monitor the anticoagulation effect or drug concentration levels, overstated and misrepresented fact that Eliquis has less major bleeding than warfarin, and overstated and misrepresented the therapeutic benefit of the drug.   Further, Defendants failed to adequately and accurately

---

[1] All clinical trials submitted for FDA approval of Eliquis were industry sponsored.

convey the length of time in which patients must be off of Eliquis prior to any procedure.  This pharmaceutical lacks an appropriate safety shield which has become a standard in the pharmaceutical industry.

56.    At all times relevant hereto, Defendants also failed adequately to warn emergency room doctors, surgeons, and other critical care medical professionals that unlike generally-known measures taken to treat and stabilize bleeding in users of Warfarin, there is no effective agent to reverse the anticoagulation effects of Eliquis or determine the amount of Eliquis in a patient's system or the anticoagulation effects of the drug and therefore no effective means to treat and stabilize patients who experience uncontrolled bleeding while taking Eliquis.

57.    After marketing Eliquis, Defendants became aware of many reports of serious hemorrhaging in users of its drugs, both as reported to the FDA and to them directly. Yet Defendants have not fully disclosed to the medical profession or patients which the incidence of such adverse reactions are.

58.    Despite the clear signals generated by this side effect data collected after Eliquis' 2012 FDA approval, Defendants failed to either alert the public, the FDA and the scientific community or perform further investigation into the safety of Eliquis.

59.    In general, since its approval in 2012, there has been a growing concern amongst physicians regarding the absence of guidance for dealing with the unstoppable bleeds of Eliquis.

60.    Numerous other studies published after Eliquis' approval in 2012 confirm the problematic bleeding events associated with Eliquis, and critique the complete lack of ability to stop a bleeding event once one occurs.

61.    Despite a ballooning market share and a 400% increase in prescriptions of Eliquis in 2015, Defendants have relayed very little information on how to stop a potentially life

threatening bleeding event.

62.    With no readily available reversal strategy, many patients, such as Plaintiff herein, have been substantially injured.

63.    Defendants marketing, selling, and distributing a drug with no known mechanism to stop the bleeding once it starts is an unreasonably dangerous design of the drug.

64.    Significant questions have also been as to the validity of the ARISTOTLE data and the Eliquis label regarding the twice-a-day dosing strategy.

65.    The label, in the Warning and Precaution Section, fails to adequately warn physicians and patients that the amount of Eliquis will accumulate in certain patients exposing them to an increased risk of bleeding and there is a significant intra-and inter patient variability with regard to the drug levels of Eliquis despite the twice-a-day dosing at the 2.5 mg and 5 mg dosing.

66.    Studies show that blood levels of Eliquis vary widely from patient to patient with high and low blood levels strongly linked to the likelihood of major bleeding or stroke, respectively.

67.    This is because the very nature of any anti-coagulant and its effect is to be "on edge." Too much anti-coagulation will cause excessive bleeding, while too little will not have the needed effect.  That is why warfarin always required physicians to monitor the anti-coagulation level of each patient's blood.  Further, as patients age or change over time, the needed dosage of warfarin would concurrently change.  Eliquis is no different in that the level of Eliquis fluctuates despite the twice-a-day dosing system; thus, a patient on Eliquis could either fall below the amount of drug needed to be within therapeutic range or be exposed to too much of the drug.  Thus, Defendants' design is unreasonably dangerous without either a mechanism in place to accurately determine the drug concentration levels in certain patient populations or when faced with a medical emergency.

68.    Recognizing the need for monitoring, Europe approved a specific testing solution

for the measurement of apixaban that may be used in numerous situations, including when the emergency room with an adverse event or require verification of pre-operative drug clearance.

69.    Alternatively, the design of the drug with a warning that Eliquis' drug concentration levels are not stable intra and inter patient is unreasonably dangerous.    Because there are no monitoring requirements currently in place, in the hopes of being more convenient, virtually every patient is prescribed Eliquis to be taken twice per day.    Therefore, the dosage for virtually all patients is not personalized based on the patient's traits, but instead fits into one of two "methods" of prescribing.    Most A-Fib patients receive 5 mg of Eliquis to be taken twice per day.    Certain other patients – those over 80, weighing less than 132 lbs, or who show a certain level of serum creatinine, the dose is 2.5 mg twice a day.

70.    Those are the only two methods of dosing for Eliquis.    This is in sharp contrast to warfarin, which tailors a specific dosage for every patient, and then monitors that dosage to ensure the correct amount of anti-coagulation is occurring.

71.    Without a specifically tailored dose and regular monitoring, it is unclear if the correct and desired amount of anti-coagulation is occurring, leading to more bleeding events or ischemic strokes.

72.    The warning label for Eliquis is inadequate. The original Eliquis label from December 2012 does not include a BLACK BOX warning for irreversible bleeding events, no warnings regarding the inability to measure the drug concentration of Eliquis or the degree of anticoagulation, or that there is no antidote for such a bleeding event.

73.    Importantly, warning labels as recently updated as July 2016 still do not include such a BLACK BOX or BOXED warning regarding unstoppable bleeding, inability to monitor either the effects of anticoagulation or the level of drug concentration, and that there is no antidote.

74.    In contrast, Warfarin carries a black box warning of bleeding risk.

75.    In addition to its failure to adequately and appropriately update its warning labels for the Eliquis product, Defendants have failed to issue a "Dear Doctor" letter that sufficiently outlines the dangers of prescribing and administering Eliquis to a patient.

76.    The current warning is simply inadequate. The Defendants have failed and continue to fail in their duties to warn and protect the consuming public, including Plaintiff.

77.    Even if the warnings were sufficient, which Plaintiff strongly denies, Eliquis still lacks any benefit sufficient to tolerate the extreme risk posed by the ingestion of this drug.

78.    Eliquis is quite simply dangerous and defective as formulated and the Defendants should withdraw Eliquis from the market.

79.    Therefore, Defendants' original and updated product labeling and prescribing information for Eliquis:

a.    failed to investigate, research, study, and define, fully and adequately, the safety profile of Eliquis;

b.    failed to provide adequate warnings about the true safety risks associated with the use of Eliquis;

c.    failed to provide adequate warning regarding the pharmacokinetic and pharmacodynamic variability of Eliquis and its complete effects on the degree of anticoagulation in patients of various populations;

d.    failed to provide adequate warning that it is difficult or impossible to assess the degree and extent of anticoagulation in patients taking Eliquis;

e.    failed to disclose in the "Warnings" section the significance of the fact that there is no drug, agent, or means to reverse the anticoagulation effects of Eliquis during an expanded timetable;

f.    failed to advise prescribing physicians, such as the Plaintiff's physician, to instruct patients that there was no agent to reverse the anticoagulant effects of Eliquis;

g.    failed to provide adequate instructions on how to intervene and stabilize

a patient who suffers a bleed while taking Eliquis;

h.      failed to provide adequate warnings and information related to the increased risks of bleeding events associated with aging patient populations of Eliquis users;

i.      failed to provide adequate warnings regarding the increased risk of gastrointestinal bleeds in those taking Eliquis, especially, in those patients with a prior history of gastrointestinal issues and upset;

j.      failed to provide adequate warnings regarding the need to assess renal functioning prior to starting a patient on Eliquis and to continue testing and monitoring of renal functioning periodically while the patient is on Eliquis;

k.      failed to advise physicians to monitor their patients closely for signs of neurological impairment (meaning a potential stroke);

l.      failed to provide adequate warnings regarding the increased risk of suffering a bleeding event, requiring blood transfusions in those taking Eliquis;

m.      failed to provide adequate warnings regarding the need to assess hepatic functioning prior to starting a patient on Eliquis and to continue testing and monitoring of hepatic functioning periodically while the patient is on Eliquis;

n.      failed to include a "BOXED WARNING" about serious bleeding events associated with Eliquis;

o.      failed to include a "BOLDED WARNNG" about serious bleeding events associates with Eliquis;

p.      Failed to appropriately warn about the connection between physical injuries, such as head trauma, and the initiation of bleeding events;

q.      in their "Medication Guide" intended for distribution to patients to whom Eliquis has been prescribed, Defendants failed to disclose to patients that there is no drug, agent or means to reverse the anticoagulation effects of Eliquis and that if serious bleeding occurs, such irreversibility could have permanently disabling, life-threatening or fatal consequences;

r.      failed to warn of the severity and duration of such adverse effects, as the warning given did not accurately reflect the symptoms or severity of side effects;

s.    failed to warn regarding the need for more comprehensive, more regular medical monitoring to ensure early discovery and potentially serious side effects; and

t.    failed to instruct how to adjust the dosage to the particular patient and instead stated misleadingly and inaccurately that two available doses fits all patients.

80.    Despite being aware, *inter alia* of: (1) serious, and sometimes fatal, irreversible bleeding events associated with the use of Eliquis; and (2) more than 1,000 adverse event reports filed with the FDA in 2014 alone, including at least 100 deaths, and (3) more than 6,000 adverse event reports in 2015 consisting predominantly of hemorrhaging / gastrointestinal hemorrhaging, Defendants never strengthened their label.

81.    Despite the wealth of scientific evidence, Defendants have ignored the increased risk of the development of the aforementioned injuries associated with the use of Eliquis, but they have, through their marketing and advertising campaigns, urged consumers to use Eliquis without regular blood monitoring or instead of anticoagulants that present a safer alternative.

82.    Despite the availability of this information, there is no indication of their usage in the warning label of Eliquis.

83.    From the date Defendants received FDA approval to market Eliquis, Defendants made, distributed, marketed, and sold Eliquis without adequate warning to Plaintiff's prescribing physicians or Plaintiff that Eliquis was associates with and could cause life- threatening bleeding, presented a risk of life-threatening bleeding in patients who used it, and that Defendants had not adequately conducted complete and proper testing and studies of Eliquis with regard to severe side effects, specifically life threatening bleeding.

84.    With no readily available reversal strategy, many patients, such as Plaintiff herein, have been substantially injured.

85.     Plaintiff's doctor would not have prescribed Eliquis had his prescribing doctor received an adequate warning.

86.     And Plaintiff's doctor would have utilized monitoring test had Defendants instructed for their use.

87.     Upon information and belief, Defendants concealed and failed to completely well as its knowledge that they had failed to fully test or study said risk.

88.     Defendants ignored the association between the use of Eliquis and the risk of developing life-threatening bleeding.

89.     Defendants' failure to disclose information that they possessed regarding the failure to adequately test and study Eliquis for life-threatening bleeding risk further rendered warnings for this medication inadequate.

90.     By reason of the foregoing acts and omissions, Plaintiff has endured and continues to suffer emotional and mental anguish, loss of support, loss of services, medical and funeral expenses, and other economic and non-economic damages stemming from the injury of the Plaintiff, as a result of the actions and inactions of theDefendants.

## FIRST CAUSE OF ACTION
## NEGLIGENCE

91.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.   Plaintiff pleads this Count in the broadest sense available under the law, to include pleading same pursuant to all substantive law that applies to this case, as may be determined by choice of law principles, regardless of whether arising under statute and/or common law.

92.     At all times relevant hereto, Defendants had a duty to exercise reasonable care in

the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale and distribution of Eliquis into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

93. Defendant failed to exercise ordinary care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and distribution of Eliquis into interstate commerce in that Defendant knew or should have known that using Eliquis created a high risk of unreasonable, dangerous side effects, including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life and, in some cases, death.

94. The negligence of the Defendant, their agents, servants, and employees, included but was not limited to the following acts and omissions:

(a) Manufacturing, producing, promoting, formulating, creating, and designing Eliquis without thoroughly testing it;

(b) Manufacturing, producing, promoting, formulating, creating, and designing Eliquis without adequately testing it;

(c) Not conducting sufficient testing programs to determine whether or not Eliquis was safe for use; in that Defendant herein knew or should have known that Eliquis was unsafe and unfit for use by reason of the dangers to its users;

(d) Selling Eliquis without making proper and sufficient tests to determine the dangers to its users;

(e) Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and healthcare profession, and the FDA of the dangers of Eliquis;

(f) Failing to provide adequate instructions regarding safety precautions to be observed by users, handlers, and persons who would reasonably and

foreseeably come into contact with, and more particularly, use, Eliquis;

(g) Failing to test Eliquis and failing to adequately, sufficiently and properly test Eliquis.

(h) Negligently advertising and recommending the use of Eliquis without sufficient knowledge as to its dangerous propensities;

(i) Negligently representing that Eliquis was safe for use for its intended purpose, when, in fact, it was unsafe;

(j) Negligently representing that Eliquis had equivalent safety and efficacy as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

(k) Negligently designing Eliquis in a manner which was dangerous to its users;

(l) Negligently manufacturing Eliquis in a manner which was dangerous to its users;

(m) Negligently producing Eliquis in a manner which was dangerous to its users;

(n) Negligently assembling Eliquis in a manner which was dangerous to its users;

(o) Concealing information from the Plaintiff in knowing that Eliquis was unsafe, dangerous, and non-conforming with FDA regulations;

(p) Improperly concealing and misrepresenting information from the Plaintiff, healthcare professionals, and the FDA, concerning the severity of risks and dangers of Eliquis compared to other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non - valvular atrial fibrillation, reducing the risk of recurrence of DVT and PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery; and,

(q) Negligently represented that the 2.5 mg or 5 mg is suitable for all patients, whereas they knew or should have known that proper dosage depending on

individualizing factors in users.

95.    Defendant under-reported, underestimated and downplayed the serious dangers of Eliquis.

96.    Defendant negligently compared the safety risk and dangers of Eliquis with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

97.    Defendant was negligent in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing and sale of Eliquis in that they:

<div style="margin-left:2em">

(a)    Failed to use due care in designing and manufacturing Eliquis so as to avoid the aforementioned risks to individuals when Eliquis was used for treatment for reducing the risk of stroke and systemic embolism in patients with non - valvular atrial fibrillation, reducing the risk of recurrence of DVT and PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

(b)    Failed to accompany their product with proper and accurate warnings regarding all possible adverse side effects associated with the use of Eliquis;

(c)    Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and malfunction of Eliquis;

(d)    Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Eliquis;

(e)    Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects;

(f)    Failed to conduct adequate testing, including pre-clinical and clinical testing and post- marketing surveillance to determine the safety of Eliquis;

(g)    Failed to warn Plaintiff, prior to actively encouraging the sale of Eliquis, either directly or indirectly, orally or in writing, about the need for more

</div>

comprehensive, more regular medical monitoring than usual to ensure early discovery of potentially serious side effects;

(h)    Failed to instruct how to adjust the dosage to the particular patient and instead stated misleadingly that one dosage fit all patients;

(i)    Were otherwise careless and negligent.

98.    Despite the fact that Defendants knew or should have known that Eliquis caused unreasonably dangerous side effects, Defendants continued and continue to market, manufacture, distribute and sell Eliquis to consumers, including the Plaintiff.

99.    Defendants knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

100.    Defendant's negligence was the proximate cause of Plaintiff's injuries, harm and economic loss, which Plaintiff suffered.

101.    As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side effects including, bleeding, physical pain and mental anguish, diminished enjoyment of life, medical expenses, and loss of earnings.

102.    **WHEREFORE**, the Plaintiff prays for judgment against Defendants, in such an amount in excess of $50,000.00 plus costs of suit.

## SECOND CAUSE OF ACTION
## STRICT PRODUCTS LIABILITY

103.    At all times relevant hereto, Defendants designed, manufactured, researched, tested, advertised, promoted, marketed, labeled, sold, distributed and otherwise placed into the stream of commerce, pharmaceuticals, including Eliquis, for the sale to, and use by, members of the general public and specifically to Plaintiff.

104.    The Eliquis designed, manufactured, researched, tested, advertised, promoted, marketed, labeled, sold, and distributed by Defendants reached Plaintiff without substantial change and was ingested as directed.

105.    At those times, Eliquis was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiff herein.

106.    The Eliquis designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Eliquis.

107.    The Eliquis designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective in design and/or formulation, in that, when it left the hands of the Defendants manufacturers and/or suppliers, it was unreasonably dangerous, and it was more dangerous than an ordinary consumer would expect.

108.    At all times herein mentioned, Eliquis was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form as provided by the Defendants.

109.    Defendants knew, or should have known that at all times herein mentioned its Eliquis was in a defective condition, and was and is inherently dangerous and unsafe.

110.    At the time of the Plaintiff's use of Eliquis, Eliquis was being used for the purposes and in a manner normally intended, namely to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery

111.    Defendants, with this knowledge, voluntarily designed Eliquis in a dangerous condition for use by the public, and in particular the Plaintiff.

112.    Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

113.    Defendants created a product unreasonably dangerous for its normal, intended use.

114.    The Eliquis designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was manufactured defectively in that Eliquis left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

115.    The Eliquis designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Eliquis was manufactured.

116.    Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed a defective product which created an unreasonable risk to the health of consumers and to the Plaintiff in particular, and Defendants are therefore strictly liable for the injuries sustained by the Plaintiff.

117.    The Plaintiff could not, by the exercise of reasonable care, have discovered Eliquis's defects herein mentioned and perceived its danger.

118.    The Eliquis designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate warnings or instructions as the Defendants knew or should have known that the product created a risk of serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature and the Defendants failed to adequately warn of said risk.

119.    The Eliquis ingested by Plaintiffs was in the same or substantially similar condition as it was when it left the possession of Defendants.

120.    Plaintiff did not misuse or materially alter their Eliquis.

121.    Defendants are strictly liable for Plaintiffs' injuries in the following ways:

a.  Eliquis as designed, manufactured, sold and supplied by the Defendants, was defectively designed and placed into the stream of commerce by Defendants in a defective and unreasonably dangerous condition;

b.  Defendants failed to properly market, design, manufacture, distribute, supply and sell Eliquis;

c.  Defendants failed to warn and place adequate warnings and instructions on Eliquis;

d.  Defendants failed to adequately test Eliquis;

e.  Defendants failed to provide timely and adequate post-marketing warnings and instructions after they knew of the risk of injury associated with the use of Eliquis, and,

f.  A feasible alternative design existed that was capable of preventing Plaintiff's injuries.

122.    Among other things, Defendants—prior to FDA approval— should have, but failed to design:

a.  an Eliquis-specific test so doctors could monitor Eliquis's anticoagulation effect in each patient and could, along with the patient, weigh the risks and determine whether to take Eliquis;

b.  design and market an antidote to counteract a major bleeding event; and

c.  a label that warns that a bleeding event without a reversal agent or ability to measure the degree of anticoagulation could result in a worse outcome than those anticoagulants with reversal agents or laboratory testing for monitoring.

123.    The Eliquis designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks of serious side effects including, life-threatening bleeding, as well as other severe and permanent health consequences from Eliquis, they failed to provide adequate warnings to users or consumers

of the product, and continued to improperly advertise, market and/or promote their product, Eliquis.

124.    By reason of the foregoing, the Defendants have become strictly liable in tort to the Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Eliquis.

125.    Defendants' defective design, manufacturing defect, and inadequate warnings of Eliquis were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

126.    That said defects in Defendants' drug Eliquis were a substantial factor in causing Plaintiff's injuries.

127.    As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side effects including, life threatening bleeding and sudden death, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, and diminished enjoyment of life.

128.    At all times relevant hereto, the Eliquis designed, manufactured, researched, tested, advertised, promoted, marketed, labeled, sold, and distributed by Defendants was, and still is, defective, unsafe and inherently dangerous and Defendants knew or should have known that Eliquis was, and still is, defective, unsafe and inherently dangerous, especially when used in the form and manner provided, directed, marketed and advertised by the Defendants.

129.    Defendants, as manufacturers and distributors of pharmaceutical drugs, including Eliquis, are held to the level of knowledge of an expert in the field, and further, Defendants knew or should have known that warnings and other clinically relevant information and data which they distributed regarding the risks of irreversible bleeds and other injuries and death associated with the use of Eliquis were inadequate.

130.    Defendants had and continue to have a duty to design and manufacture a product that was not unreasonable dangerous for its normal, usual and intended use.

131.    Defendants designed, manufactured, researched, tested, advertised, promoted, marketed, labeled, sold, and distributed an unreasonably dangerous and defective prescription drug, Eliquis, which created an unreasonable risk to the health of consumers and to the Plaintiff, specifically; and Defendants are therefore strictly liable for the injuries sustained by the Plaintiff.

132.    The Eliquis designed, manufactured, researched, tested, advertised, promoted, marketed, labeled, sold, and distributed by the Defendants reached their intended users in the same defective and unreasonably dangerous condition in which it was manufactured.

133.    The Plaintiff could not, by the exercise of reasonable care, have discovered Eliquis' defects herein and perceived its danger.

134.    Defendants had and continue to have a duty to provide consumers, including Plaintiff and Plaintiff's physicians, with warnings and other clinically relevant information and data regarding the risks and dangers associated with Eliquis, as it became or could have become available to Defendants.

135.    Defendants designed, manufactured, researched, tested, advertised, promoted, marketed, labeled, sold, and distributed an unreasonably dangerous and defective prescription drug, Eliquis, to health care providers empowered to prescribe and dispense Eliquis to consumers, including Plaintiff, without adequate warnings and other clinically relevant information and data.

136.    As detailed above, through both omission and affirmative misstatements, Defendants misled the medical community about the risk and benefit balance of Eliquis, which resulted in injury to Plaintiff.

137.    As noted above, despite the fact that Defendants knew or should have known that Eliquis caused unreasonable and dangerous side effects, they continued to promote, market, label, advertise, distribute and sell Eliquis without stating that there existed safer and more or equally effective alternative drug products and/or providing adequate clinically relevant information and

data and warnings regarding the adverse health risks associated with exposure to Eliquis.

138.    The Eliquis designed, manufactured, researched, tested, advertised, promoted, marketed, labeled, sold, and distributed by the Defendants was defective due to inadequate postmarket surveillance and/or warnings because after Defendants knew or should have known of the risks of serious side effects, the failed to provide adequate warnings to users and/or consumers of the product and continued to promote, market, advertise, distribute and sell Eliquis.

139.    Defendants knew or should have known that consumers, including Plaintiff, would foreseeably and needlessly suffer injury or death as a result of Defendants' failures.

140.    Defendants' defective design, manufacture, research, testing, advertising, promoting, marketing, labeling, sale, and distribution of Eliquis, as set forth herein, was done willfully, intentionally and with reckless disregard to the life and safety of Plaintiff and the general public.

141.    Based on the foregoing, the Defendants are strictly liable to the Plaintiff for the design, manufacture, research, testing, advertising, promoting, marketing, labeling, sale, and distribution of a defective product, Eliquis.

142.    The foregoing defects in the drug Eliquis were a substantial factor in causing Plaintiff's injuries.

143.    As a direct and proximate result of the actions and omission of the Defendants described herein, Plaintiff was caused to suffer serious and dangerous side effects, including severe and life-threatening bleeding, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain, and mental anguish, diminished enjoyment of life, shortened life expectancy, and expenses for hospitalization.

144.    As a direct and proximate result of the actions and omission of the Defendants described herein, Plaintiff suffered and incurred damages, including medical expenses; and other

economic and non-economic damages flowing from the injuries of the Plaintiff.

145.    WHEREFORE, Plaintiff prays for judgment against Defendants, in such amount in excess of $50,000.00 plus costs of suit.

<div align="center">

**FOURTH CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY**

</div>

146.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

147.    Defendant expressly warranted that Eliquis was safe and well accepted by users.

148.    Eliquis does not conform to these express representations because Eliquis is not safe and has numerous serious side effects, many of which were not accurately warned about by Defendant. As a direct and proximate result of the breach of said warranties,

149.    Plaintiff suffered and will continue to suffer severe and permanent personal injuries, harm and economic loss.

150.    Plaintiff did rely on the express warranties of the Defendant herein.

151.    Members of the medical community, including physicians and other healthcare professionals, relied upon the representations and warranties of the Defendant for use of Eliquis in recommending, prescribing, and dispensing Eliquis.

152.    The Defendant herein breached the aforesaid express warranties, as their drug Eliquis was defective.

153.    Defendant expressly represented to Plaintiff, Plaintiff's physicians, healthcare providers, and the FDA that Eliquis was safe and fit for use for the purposes intended, that it was of merchantable quality, that it did not produce any dangerous side effects in excess of those risks associated with other forms of treatment for reducing the risk of stroke and systemic embolism in

patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, that the side effects it did produce were accurately reflected in the warnings and that it was adequately tested and fit for its intended use.

154.    Defendant knew or should have known that, in fact, said representations and warranties were false, misleading and untrue in that Eliquis was not safe and fit for the use intended, and, in fact, produced serious injuries to the users that were not accurately identified and represented by Defendant.

155.    As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side effects including, bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, medical expenses, and loss of earnings.

156.    Plaintiffs plead this Count in the broadest sense available under the law, to include pleading the same pursuant to all substantive law that applies to this case as may be determined by choice of law principles regarding or whether arising under statute and/or common law and reserves its rights to amend this cause of action or seek a court order to apply any applicable law of Plaintiff's home state. WHEREFORE, Plaintiffs demand judgment against all named Defendants, jointly and severally, for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

<u>**FIFTH CAUSE OF ACTION**</u>
<u>**BREACH OF IMPLIED WARRANTY**</u>

157.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

158.    At all times relevant hereto, Defendants designed, manufactured, researched,

tested, advertised, promoted, marketed, labeled, sold, distributed and otherwise placed into the stream of commerce, the prescription drug, Eliquis.

159.    At all times that Defendants designed, manufactured, researched, tested, advertised, promoted, marketed, labeled, sold, distributed and otherwise placed into the stream of commerce, the prescription drug, Eliquis, they knew of its intended uses to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reduce the risk of recurrence of DVT and/or PE and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

160.    At the time Defendant marketed, sold, and distributed Eliquis for use by Plaintiff, Defendant knew of the use for which Eliquis was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

161.    Defendants impliedly represented and warranted Eliquis to Plaintiff, Plaintiff's physicians, the general public and the medical profession at large, that Eliquis was safe and of merchantable quality and was fit for use for the ordinary purposes for which the product was to be used, as set forth above.

162.    Members of the consuming public, including consumers such as Plaintiffs, were intended third party beneficiaries of the warranty.

163.    Eliquis was not merchantable and fit for its ordinary purpose, because it has a propensity to lead to the serious personal injuries described in this Complaint.

164.    Eliquis does not conform to those representations and warranties made by Defendants because it is not safe, not of merchantable quality, not fit for its intended uses, and has numerous serious side effects, including life-threatening and irreversible bleeding events.

165.    Defendants' implied representations and warranties were false, misleading, and

inaccurate because Eliquis was unsafe, unreasonably dangerous, improper, not of merchantable quality, not fit for its intended uses and defective.

166.    Members of the medical community, including Plaintiff's prescribing physicians, relied upon the implied representations and warranties of the Defendants for use of Eliquis in recommending, prescribing and/or dispensing Eliquis to their patients, including the Plaintiff.

167.    Plaintiffs and Plaintiff's prescribing physicians reasonably relied on Defendants' representations that Eliquis was safe and free of defects and was a safe means of reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat Deep Vein Thrombosis ("DVT") and Pulmonary Embolism ("PE"), to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

168.    Plaintiff, and other members of the general and consuming public were the intended third-party beneficiaries of the warranty.

169.    Plaintiff relied on the representations and warranties of the Defendants that Eliquis was safe and effective for treatment of non-valvular atrial fibrillation when he took the medication.

170.    Defendants' breach of their implied warranties of merchantability and fitness for a particular purpose were the direct and proximate result of the Plaintiff's injuries.

171.    As a direct and proximate result of the actions and omission of the Defendants described herein, Plaintiff was caused to suffer serious and dangerous side effects, including severe and life-threatening bleeding, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain, and mental anguish, diminished enjoyment of life, shortened life expectancy, and expenses for hospitalization.

172.    As a direct and proximate result of the actions and omission of the Defendants described herein, Plaintiff suffered and incurred damages, including medical expenses; and other

economic and non-economic damages flowing from the injuries of the Plaintiff.

173.    Plaintiff seeks all damages to which Plaintiff may be justly entitled.

174.    Plaintiffs plead this Count in the broadest sense available under the law, to include pleading the same pursuant to all substantive law that applies to this case as may be determined by choice of law principles regarding or whether arising under statute and/or common law and reserves its rights to amend this cause of action or seek a court order to apply any applicable law of Plaintiff's home state. WHEREFORE, Plaintiffs demand judgment against all named Defendants, jointly and severally, for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## FIFTH CAUSE OF ACTION
## FRAUDULENT MISREPRESENTATION

175.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

176.    The Defendant falsely and fraudulently represented to the medical and healthcare community, Plaintiff's prescribing physician, and to the Plaintiff, and the FDA, and the public in general, that said product, Eliquis, had been tested and was found to be safe and effective to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

177.    That representations made by Defendant was, in fact, false.

178.    When said representations were made by Defendant, they knew those representations to be false and it willfully, wantonly and recklessly disregarded whether the representations were true.

179.    These representations were made by said Defendant with the intent of defrauding

and deceiving the Plaintiff, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical and healthcare community in particular, to recommend, prescribe, dispense and purchase said product, Eliquis, for use to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, all of which evinced a callous, reckless, willful, depraved indifference to the health, safety and welfare of the Plaintiff herein.

180.    At the time the aforesaid representations were made by the Defendant and, at the time the Plaintiff used Eliquis, the Plaintiff was unaware of the falsity of said representations and reasonably believed them to be true.

181.    In reliance upon said representations, the Plaintiff was induced to and did use Eliquis, thereby sustaining severe and permanent personal injuries.

182.    Said Defendant knew and were aware or should have been aware that Eliquis had not been sufficiently tested, was defective in nature, and that it lacked adequate and sufficient warnings.

183.    Defendant knew or should have known that Eliquis had a potential to, could, and would cause severe and grievous injury to the users of said product, and that it was inherently dangerous in a manner that exceeded any purported, inaccurate, and down-played warnings.

184.    Defendant brought Eliquis to the market, and acted fraudulently, wantonly and maliciously to the detriment of the Plaintiff.

185.    As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side effects including, bleeding, as well as other severe and person injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, medical expenses, and loss of earnings.

186.    By reason of the foregoing, Plaintiff has suffered injuries and damages as alleged herein.

187.    Plaintiffs plead this Count in the broadest sense available under the law, to include pleading the same pursuant to all substantive law that applies to this case as may be determined by choice of law principles regarding or whether arising under statute and/or common law and reserves its rights to amend this cause of action or seek a court order to apply any applicable law of Plaintiff's home state. WHEREFORE, Plaintiffs demand judgment against all named Defendants, jointly and severally, for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## SIXTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

188.   Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

189.   Defendant had a duty to represent to the medical and healthcare community, and to the Plaintiff, the FDA, and the public in general that said product, Eliquis, had been tested and found to be safe and effective to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

190.   The representations made by Defendant was, in fact, false.

191.   Defendant failed to exercise ordinary care in the representation of Eliquis, while involved in its manufacture, sale, testing, quality assurance, quality control, and distribution of said product into interstate commerce, in that Defendant negligently misrepresented Eliquis' high risk of unreasonable, dangerous side effects.

192. Defendant breached their duty in representing Eliquis' serious side effects to the medical and healthcare community, to the Plaintiff, the FDA and the public in general.

193. As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side effects including, bleeding, as well as other severe and person injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, medical expenses, and loss of earnings.

194. Plaintiffs plead this Count in the broadest sense available under the law, to include pleading the same pursuant to all substantive law that applies to this case as may be determined by choice of law principles regarding or whether arising under statute and/or common law and reserves its rights to amend this cause of action or seek a court order to apply any applicable law of Plaintiff's home state. WHEREFORE, Plaintiffs demand judgment against all named Defendants, jointly and severally, for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## SEVENTH CAUSE OF ACTION
## VIOLATION OF CONSUMER PROTECTION LAWS

195. Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

196. Defendants havea statutory duty to refrain from making false or fraudulent representations and from engaging in deceptive acts or practices in the sale and promotion of Eliquis pursuant to the Illinois Consumer Fraud and Deceptive Practices Act.

197. Defendants engaged in unfair, deceptive, false and fraudulent acts and practices in violation of state law through its false and misleading promotion of Eliquis designed to induce Plaintiff to purchase and use Eliquis.

198. Defendant's conduct as described herein constituted unfair and deceptive acts and

practices, including, but not limited to:

    a.  Publishing instructions and product material containing inaccurate and incomplete factual information;

    b.  Misrepresenting the nature, quality, and characteristics about the product; and

    c.  Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

199.    Defendants misrepresented the alleged benefits of Eliquis, failed to disclose material information concerning known side effects of Eliquis, misrepresented the quality of Eliquis, and otherwise engaged in fraudulent and deceptive conduct which induced Plaintiff to purchase and use Eliquis.

200.    Defendants uniformly communicated the purported benefits of Eliquis while failing to disclose the serious and dangerous side-effects related to the use of Eliquis, its safety, its efficacy, and its usefulness. Defendant made these representations to physicians, the medical community at large, and to patients and consumers such as Plaintiff in the marketing and advertising campaign described herein.

201.    Defendants's conduct in connection with Eliquis was impermissible and illegal in that it created a likelihood of confusion and misunderstanding, because Defendants misleadingly, falsely and / or deceptively misrepresented and omitted numerous material facts regarding, among other things, the utility, benefits, costs, safety, efficacy and advantages of Eliquis.

202.    Defendants' conduct as described above was a material cause of Plaintiff's decision to purchase Eliquis.

203.    As a direct, foreseeable and proximate cause of Defendant's conduct in violation of Illinois law the Plaintiff suffered damages, including personal injuries, economic damages, and non-economic damages.

204.    As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side effects including, bleeding, as well as other severe and person injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, medical expenses, and loss of earnings.

## EQUITABLE TOLLING OF APPLICABLE
## STATUTES OF LIMITATIONS

205.    Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

206.    Defendant failed to disclose a known defect and affirmatively misrepresented that Eliquis was safe for its intended use.  Further, Defendant actively concealed the true risks associated with the use of Eliquis.  Neither Plaintiff nor Plaintiff's prescribing physicians had knowledge that Defendant was engaged in the wrongdoing alleged herein.  Because of Defendant's concealment of and misrepresentations regarding the true risks associated with Eliquis, Plaintiff could not have reasonably discovered Defendant's wrongdoing at any time prior to the commencement of this action.

207.    Thus, because Defendant fraudulently concealed the defective nature of Eliquis and the risks associated with its use, the running of any statute of limitations has been tolled. Likewise, Defendant is estopped from relying on any statute of limitations.

208.    Additionally, and alternatively, Plaintiff files this lawsuit within the applicable limitations period of first suspecting that Eliquis caused the appreciable harm sustained by Plaintiff.  Plaintiff did not have actual or constructive knowledge of facts indicating to a reasonable person that Plaintiff was the victim of a tort.  Plaintiff was unaware of the facts upon

which a cause of action rests until less than the applicable limitations period prior to the filing of this action. Plaintiff's lack of knowledge was not willful, negligent, or unreasonable.

## **JURY TRIAL DEMANDED**

209.    Plaintiff demands that all issues of fact of this case be tried to a properly impaneled jury to the extent permitted under the law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against the Defendants on each of the above-referenced claims and Causes of Action and as follows:

1.    Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages available by law or statute in an amount to be determined at trial of this action;

2.    Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages paid or owed by Plaintiff in an amount to be determined at trial of this action;

3.    Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants, which constitute gross negligent, as Defendants demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct;

4.    Prejudgment interest;

5.    Post-judgment interest;

6.    Awarding Plaintiff the costs of these proceedings; and

Such other and further relief as this Court deems just and proper.


Dated:  May 23, 2017                              RESPECTFULLY SUBMITTED,

                                                              BY:___/s/ Lisa Causey-Streete_____

**SALIM-BEASLEY, LLC**
Robert L. Salim
Lisa Causey-Streete
1901 Texas Street
Natchitoches, LA 71457
Phone: (318) 352-5999
Fax: (318) 352-5998
Email: robertsalim@cp-tel.net
Email: lcausey@salim-beasley.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing document was electronically served on all counsel of record through the Court's CM/ECF system on this 23rd day of May, 2017.

*/s/ Lisa Causey-Streete*
Lisa Causey-Streete